Trigg *v.* Trigg, et al.

No. 40611 March 17, 1958 101 So. 2d 507

*Floyd, Cameron & Deen,* Meridian, for appellant.

*W. Vol Jones,* Waynesboro; *Ethridge, Minniece & Bourdeaux,* Meridian, for appellees.

KYLE, J.

This case is before us on appeal by Roy L. Trigg, who is also referred to in the record as R. L. Trigg, and his wife, Juanita Janet Trigg, defendants in the court below, from a decree of the Chancery Court of Wayne County, rendered in favor of Beverly P. Trigg and others, complainants in the court below, establishing a resulting trust for the benefit of the complainants and the defendant, Roy L. Trigg, in 174 acres of land conveyed to Roy L. Trigg by W. S. Trigg, now deceased, by a warranty deed of conveyance absolute on its face, dated July 26, 1937.

The record shows that W. S. Trigg died on February 8, 1942, and that he left surviving him as his only heirs-at-law his widow, Mrs. Viola Trigg, and nine children, namely, Roy L. Trigg, Billy B. Trigg, Mrs Allie Hutto, O. K. Trigg, Edgar Trigg, Victor E. Trigg, Carlos Trigg, Norman Trigg, and Mrs. Lettie Trigg Cooper, and also five grandchildren, including the above mentioned Beverly P. Trigg, who were the children of W. L. Trigg, deceased son of the said W. S. Trigg. Mrs. Lettie Trigg Cooper died sometime before the filing of the bill of complaint and left surviving her as her only heirs-at-law five children, one of whom, Jimmy Cooper, died sometime

after the death of his mother, leaving as his only heirs four children. All of the above mentioned children and other lineal descendants of the said W. S. Trigg were named as parties complainant or as parties defendant in the bill of complaint, except Carlos Trigg, who had conveyed his interest in the above mentioned land to his granddaughter, Carol Day, and Norman Trigg who had conveyed his interest in the land to his son, Norman Trigg, Jr. Carol Day and Norman Trigg, Jr., were also named as parties complainant.

The bill of complaint was filed on February 20, 1956. Roy L. Trigg and his wife, Juanita Janet Trigg, and Winston L. Stokes, lessee under an oil, gas and mineral lease executed by Roy L. Trigg and his wife on September 1, 1955, and also Mrs. Viola Trigg, Billy B. Trigg and certain nonresident and minor heirs of Jimmy Cooper, deceased, were named as defendants. The Humble Oil and Refining Company, assignee of the above mentioned oil, gas and mineral lease, was later permitted to intervene as a defendant.

In their bill the complainants alleged that on November 1, 1923, W. S. Trigg executed a mortgage deed of trust on the above mentioned 174 acres of land and other lands owned by him to the Federal Land Bank of New Orleans, for the purpose of securing the repayment of a loan of $2500 made to him by the Federal Land Bank; that thereafter W. S. Trigg became indebted to Roy L. Trigg for money advanced to him by Roy L. Trigg during the depression years, and being thus indebted to Roy L. Trigg in the sum of $958, on July 26, 1937, executed a deed purporting to convey the 174 acres of land to Roy L. Trigg in an effort to secure the payment of said indebtedness; that although the deed was absolute in form, it was executed with the intention that it should be a mortgage as security for the indebtedness then owing by W. S. Trigg to Roy L. Trigg and any future advancements which might be made thereafter by Roy L. Trigg to W.

S. Trigg; that the said W. S. Trigg remained in possession of the 174 acres of land until his death on February 8, 1942; and that after his death the heirs remained in possession of the land. The complainants further alleged that the above mentioned deed was not delivered to Roy L. Trigg during the lifetime of W. S. Trigg, but was placed among the papers of W. S. Trigg in his home at Clara, Mississippi, and was found in a trunk among his papers after his death; that Roy L. Trigg came into possession of the deed a short time after the death of his father, but withheld it from record until June 11, 1951. The complainants further alleged in their bill that after the death of W. S. Trigg defaults were made in the payment of the annual installments of principal and interest becoming due on the mortgage indebtedness due and owing to the Federal Land Bank, and to prevent a foreclosure of the mortgage, Donald L. Cooper and James L. Cooper, two of the heirs, paid the past due installments and interest, leaving a balance of $689 still owing to the Federal Land Bank, and that said balance was paid on January 1, 1946, out of the proceeds of the sale of timber. The complainants further alleged that another sale of merchantable timber was made in 1951, and out of the proceeds of that sale the said Roy L. Trigg was paid the sum of $2,697, which represented the balance due him on account of the advancements made by him to W. S. Trigg during his lifetime, with interest; that Roy L. Trigg, on June 18, 1951, advised the other heirs that the balance of the proceeds derived from the sale of said timber, after the payment to him of said sum of $2,697 would be distributed among the heirs in the proportions which they owned in the surface of the land; and that the balance of the proceeds derived from the sale of said timber was so distributed among the heirs. The complainants further alleged that the said Roy L. Trigg had conducted himself in all respects as a trustee, under the circumstances, would do or should do, until September 1, 1955,

when he and his wife executed an oil, gas and mineral lease on the 174 acres of land to Winston L. Stokes, for oil, gas and mineral exploration, and received the full cash consideration therefor, which amounted to $3,480, but failed and refused to make a distribution thereof among the heirs; and that since that time the said Roy L. Trigg had claimed to be the sole owner of the land to the exclusion of the other heirs.

The complainants alleged that Roy L. Trigg had been fully paid for all amounts due him by the said W. S. Trigg, deceased; and that by the execution of the above mentioned oil, gas and mineral lease purporting to lease the entire interest in said land for oil, gas and mineral exploration, the said Roy L. Trigg had breached his trust; and that the deed dated July 26, 1937, should be cancelled as a cloud upon the title of the heirs, and that Roy L. Trigg should be required to divide the proceeds of said oil, gas and mineral lease among the heirs according to their respective interests. The complainants therefore prayed that the deed from W. S. Trigg and his wife to Roy L. Trigg be cancelled as a cloud upon the title of the heirs, as mortgages are cancelled after satisfaction, and that the oil, gas and mineral lease executed by Roy L. Trigg and his wife to Winston L. Stokes be cancelled as a cloud upon the title of the heirs, or in the alternative that a judgment be rendered against Roy L. Trigg in favor of the heirs for ten-elevenths of the total consideration received for said lease. The complainants also prayed for general relief.

The defendants, Roy L. Trigg and his wife Juanita Janet Trigg, in their answer, admitted the ownership of the above mentioned land by W. S. Trigg, deceased, during his lifetime, and the execution by him of the mortgage deed of trust to the Federal Land Bank on November 1, 1923. The defendants also admitted the execution of the deed of conveyance by W. S. Trigg and his wife to Roy L. Trigg on July 26, 1937, but denied that the deed was

intended as a mortgage to secure advancements made by Roy L. Trigg to the said W. S. Trigg. The defendants denied that the deed was placed among the papers of W. S. Trigg at his home in Clara and was not delivered during his lifetime; and the defendants denied that Roy L. Trigg had advised the other heirs at any time that he was holding the land in trust for them. The defendants admitted that they had executed the oil, gas and mineral lease to Winston L. Stokes on September 1, 1955, and that Roy L. Trigg claimed to be the owner of the land exclusive of all other persons except Winston L. Stokes, who was the owner of the oil, gas and mineral lease. The defendants denied that the complainants were entitled to the relief prayed for in their bill of complaint. The defendants also pleaded in bar of the complainants' suit the ten-year statutes of limitation, sections 709, 718 and 719, Code of 1942. The defendants also alleged in their answer that the complainants were barred by laches from maintaining their suit.

Winston L. Stokes and Humble Oil & Refining Company filed a separate answer, in which they averred that the said Winston L. Stokes had purchased the oil, gas and mineral lease from Roy L. Trigg and his wife in good faith and without actual or constructive notice of the complainants' claims, as set forth in the bill of complaint; and they ask that the oil, gas and mineral lease be adjudged to be a valid lease covering the full, oil, gas and mineral interest of all of the parties in the land.

Twenty-five witnesses testified during the hearing before the chancellor, including several of the complainants, and also Roy L. Trigg and his wife, and Mrs. Viola Trigg. None of the interested parties, however, were permitted to testify concerning facts which occurred prior to the death of W. S. Trigg.

The testimony shows that Roy L. Trigg worked for the government for many years; that he was living in Galveston, Texas, at the time the deed referred to in the

bill of complaint was executed; and that he had advanced money to his father from time to time during the depression years to meet emergency requirements. But no exact statement of the amounts thus advanced by him appears in the record. Most of the complainants' proof relating to the indebtedness owing by W. S. Trigg to Roy at the time the above mentioned deed was executed, and the facts leading up to the execution of the deed, consists of letters written by W. S. Trigg to Roy prior to the date of the execution of the deed.

The complainants caused to be identified and offered in evidence during the trial a letter written by W. S. Trigg to Roy on October 14, 1936, in which W. S. Trigg stated to Roy that a representative of the Federal Land Bank had notified him they were going to foreclose the Federal Land Bank mortgage at once unless an immediate payment of $640 was made on the past due indebtedness owing to the bank; that Carlos had agreed to let him have the $640 to make the payment, with the understanding that the amount should be repaid to him as soon as W. S. Trigg could get the money from Roy; and that if Roy would send him the $640 to help save the place, he would have Carlos prepare, and he would execute, a second mortgage on the land and send it to Roy to make him safe until he could cut some timber and repay the loan. Roy sent his father a cashier's check for the $640 on October 20, 1936; and on November 4, 1936, W. S. Trigg addressed another letter to Roy in which he stated that he had asked Carlos to prepare the second mortgage, but Carlos had not done so. Mr. Trigg stated in that letter, "I just want to do this so you will be safe in case I should drop out before I get to cut my timber and pay you." On December 8, 1936, W. S. Trigg wrote Roy another letter in which he stated that the Federal Land Bank had given its consent to the cutting of the timber, provided he should pay the bank $3 per thousand feet for the timber before cutting the timber. On April 20, 1937,

W. S. Trigg wrote Roy another letter in which he stated that he had a lot of timber on the yard to sell, and he wanted to start paying what he owed Roy as soon as he finished paying the local bank the amount advanced to him to enable him to obtain a release of the timber from the Federal Land Bank mortgage.

The complainants also offered in evidence, in proof of their claim that W. S. Trigg remained in possession of the land and continued to deal with the land as his own after the execution of the deed, the land assessment rolls which showed that the land was assessed to W. S. Trigg for taxes for the years 1938, 1939, 1940 and 1941, and that he received homestead exemptions on a part of the land for each of those years. It was also shown that on November 17, 1939, W. S. Trigg and his wife executed an oil, gas and mineral lease on the land to his son Carlos. Carlos several months later released his rights under the lease, and on October 25, 1940, W. S. Trigg and his wife executed an oil, gas and mineral lease on the land to H. Gwin Lewis. On November 28, 1940, W. S. Trigg leased a sawmill site on the land to J. C. Martin. All of these leases contained a general warranty of title.

Several of the complainants' witnesses testified that the day after W. S. Trigg's funeral Roy and his brothers and sisters met in the livingroom of the old home place and discussed what should be done to carry on as their father would have had them do. Some of the heirs talked about a sale of the land. But it was finally agreed that Norman Trigg should look after the land, and that Norman should have the right to issue checks against the Trigg Estate to settle claims against the estate. The indebtedness due the Federal Land Bank at that time amounted to approximately $1500. Some of the heirs knew that Roy had made advancements of money to his father, which had not been repaid. But Roy made no claim at that time that he had a deed to the 174 acres of land.

Norman testified that Roy returned to Mississippi sometime during the summer after his father's death, and Roy told Norman at that time that he had a deed to the land. Roy said to Norman, "We found it in the trunk last night, me and Miss Viola." Norman asked Roy what he was going to do about it, and Roy said that he was not going to do anything about it, that he was just going to leave it like it was. Roy said, "All I want is my money out of it, and that's all I want." Roy stated that he knew that his father had secured him, or deeded him some property, but he did not think that he had deeded him all the 174 acres. Norman stated that Roy did not show him the deed, and that he thought nothing more about it. Norman testified that from that time on he looked after everything; he looked after the collection of the estate's share of the money derived from the extraction of turpentine from the pine trees, and put the money in the bank to the credit of the "W. S. Trigg Turpentine Account." He paid for a monument which had been erected at his father's grave. He paid the taxes on the land; and he made payments on the Federal Land Bank indebtedness out of the funds coming into his hands. In 1944 Roy sold some of the timber on the land, and Norman collected the money for the timber as it was cut and put that in the bank to the credit of the W. S. Trigg Estate Account. Norman had to pay the Federal Land Bank for the timber before he could start cutting it, and he borrowed money from Jimmy Cooper, one of the heirs, to make the payment. After the timber had been cut and sold Norman mailed Jimmy Cooper a check for his money, and deposited about $500 in the bank to the credit of the W. S. Trigg Turpentine Account. Norman paid the 1945 and 1946 taxes out of that account and produced cancelled checks showing such payments.

It appears from the testimony of other witnesses that the final payment on the indebtedness due and owing to the Federal Land Bank was made sometime during the

month of January 1946 and the Federal Land Bank mortgage was cancelled.

The record shows that the 174 acres of land was woodland, covered with pine timber and a small amount of hardwood, and the income derived from the land consisted mainly of money derived from the extraction of turpentine and the periodic sales of merchantable timber and pulpwood. The next timber sale that was made after the timber cutting of 1944 and 1945, referred to in Norman's testimony, was the timber sale made to J. W. McCoy during the latter part of 1951; and there is but little testimony in the record to show how the land was managed during the five-year period immediately preceding the sale of the timber to McCoy. But the complainants offered in evidence a letter written by Roy to Victor and Norman on August 24, 1946, in which Roy referred to reports that he had heard that young pine timber was being stripped from the land, and in that letter Roy stated: "The only material to be removed from the land at this time is the dry pine tops already on the ground. For the ultimate benefit of all the heirs we cannot permit the pine tops to lie there and rot and allow young growing trees to be cut all around them." In that letter Roy also stated that it had been agreed that Norman and Victor were to be compensated at the rate of 50¢ per unit for their work after the cutting of the pulpwood, and that the remaining $2 stumpage would be placed to his credit, "to help reduce the numerous loans that I made to Papa since 15 years ago to prevent the loss of the place to the Federal Land Bank." Roy also told Norman and Victor to keep an account of the money so that there could be a fair and equitable settlement of the estate.

The record shows that the land was assessed for taxes after W. S. Trigg's death to W. S. Trigg, or Mrs. W. S. Trigg, or W. S. Trigg Estate, up to and including the year 1951; and part of the land was included in Mrs. Viola Trigg's application for homestead exemption.

Roy did not file his deed for record during his father's lifetime; and the complainants alleged in their bill that the deed was in fact never delivered to Roy, but was found in a trunk with Mr. Trigg's papers after his death. Roy and his wife denied that allegation in their answer; and Mrs. Viola Trigg and Roy's wife, Mrs. Juanita Trigg, testified that the deed was delivered to Roy at the time it was executed. Several of the complainants' witnesses, however, testified that Roy made statements to them after W. S. Trigg's death that the deed was found in Mr. Trigg's trunk after his death.

T. L. Martin, who was engaged in the mercantile business at Clara, testified that Roy came into his store several months after his father's death and asked him about a man having a deed and not putting it on record, and Roy asked him, "Would it be good?" Martin stated that he told Roy he could not sell the land unless he had the deed recorded; and Roy then told him that he got the deed out of Mr. Trigg's trunk. Norman Trigg, Beverly Trigg and Mrs. Eliza Trigg, Beverly's mother, testified that Roy told them that he and Mrs. Viola Trigg found the deed in the old trunk. Roy, who was called to testify as an adverse witness, denied that he had made such statements.

The chancellor made no finding of fact on that disputed issue. But whatever the truth may be about the matter, the record shows that Roy did not file the deed for record until June 11, 1951, a few weeks before the sale of the merchantable timber to J. W. McCoy, from the proceeds of which Roy received payment of the entire amount which he claimed his father owed him.

The complainants also offered in evidence a letter written by Roy to the heirs of his sister Lettie and the heirs of his brother Willie on June 18, 1951, in which Roy referred to the land deeded to him and to Carlos in 1937 to cover the loans which they had made on the place to prevent the Federal Land Bank from foreclosing its

mortgage; and Roy then stated: "It is my wish as previously expressed, to divide equally or share equally among the eleven heirs that which I have a deed lying west of Manor Creek and south and west of Manor Creek bridge and its highway, just as soon as the $2,697 due me is paid from the proceeds of the timber sale." In that letter Roy gave instructions concerning the prospective sale of the timber, and Roy stated that a check for the sum of $2,697 due him was to be made out by the timber buyer and mailed to him before any division of the funds could be made. The balance derived from the sale of the timber should then be divided equally, after a sufficient sum had been set aside to take care of taxes, insurance etc., for the next five years, until the timber could be cut again, "if the majority decides to keep the estate intact." The letter then concluded: "I would like to have this all settled by October 1951, and I believe it will be agreeable to all concerned. If not, may I hear your views for it is my earnest desire that this property be shared unselfishly by all members of the family as Papa always intended us to share it."

The testimony shows that Roy sold the timber to J. W. McCoy sometime during the latter part of 1951, and received the proceeds of the sale of the timber; and that Roy paid to himself out of the proceeds of the sale the amount of the indebtedness due and owing to him by W. S. Trigg at the time of his death, with accrued interest to the date of the payment. The amount Roy received in settlement of his account was approximately $2700. Roy then distributed the balance of the proceeds among the heirs, paying to each of them the sum of $94.50. Two of the heirs had died sometime prior to the sale of the timber and their shares of the residue derived from the sale of the timber was paid to their heirs.

The record shows that the land was assessed to Roy for state and county taxes after the year 1951, and the

receipts were issued thereafter in his name. But the record is silent as to the management of the land after the timber had been cut by McCoy in 1951 and 1952, except as to the execution of the oil, gas and mineral lease by Roy and his wife to Winston L. Stokes on September 1, 1955, for which Roy received the sum of $3480.

At the conclusion of the evidence the chancellor found that the actions of W. S. Trigg prior to his death in no way indicated that he thought that he had ever given a deed transferring the title of the property to Roy for Roy's own benefit. The chancellor found that W. S. Trigg continued in possession of the land until his death in 1942, and continued to exercise control over the property and claimed ownership in himself. The chancellor found that a fiduciary relationship existed between Roy and his father; and that there was no evidence in the record to indicate that W. S. Trigg sought any outside advice in his dealings with Roy. The chancellor was of the opinion that the deed was given to Roy either as a mortgage or as a trust for Roy's benefit, so that he might be secured, and that after the indebtedness due Roy had been repaid the land should be held in trust for all the heirs. The chancellor was convinced from the testimony that Roy himself considered that he was carrying out the wishes of his father in dividing the proceeds of the timber sale made to McCoy in 1951, and that Roy understood that he was not the sole owner of the land but that he held the same in trust. The chancellor also found that the complainants were not barred of their right to the relief prayed for in their bill by any statute of limitations, or by laches, for the reason that at no time had Roy ever done anything which would indicate to the other heirs that he claimed to be the sole owner of the land until July 8, 1952, when he wrote a letter to Mrs. Alice Hutto, in which he stated unequivocally for the first time that he was the owner of the land.

The chancellor found that Roy held the title to the lands in trust for all of the heirs of W. S. Trigg, de-

ceased, and that the proceeds derived from the oil, gas and mineral lease executed by Roy and his wife to Winston L. Stokes on September 1, 1955, should have been divided equally among the heirs after the payment of any expenses incurred by Roy subsequent to the settlement made by him in 1951 when he was paid $2,697 supposedly for all the indebtedness owed to him by his father and the estate. The chancellor found, however, that the Humble Oil and Refining Company was an innocent purchaser for value of the oil, gas and mineral lease, and the chancellor denied the prayer of the complainants that the lease be cancelled.

In the final decree the chancellor adjudged that the conveyance dated July 26, 1937, was intended by W. S. Trigg and Roy Trigg to be a conveyance in trust as security for the repayment of the advancements made by Roy to his father during his lifetime; and that all of said indebtedness had been paid in the year 1952 from the sale of timber. The chancellor adjudged in the decree the rights and interests of the several parties in the land; and the chancellor decreed that Roy should pay to the other heirs their distributive shares of $3,480 received by him as the consideration for the execution of the above mentioned oil, gas and mineral lease, less their proportionate parts of the taxes paid by Roy for the years 1951 to 1955, and less their proportionate parts of the sum of $300 which Roy had expended for repairs on the house.

██ █ The first point argued by the appellants' attorneys as ground for reversal of the decree of the lower court is that the decree is invalid, for the reason that the relief granted was not the relief prayed for in the bill of complaint. But we think there is no merit in this contention. The bill alleged that the deed from W. S. Trigg to Roy was intended as security for a debt, and that allegation, along with the other allegations of the bill, meant that an implied trust was thereby created, whereby Roy should be deemed to be the holder of the

legal title as security for the payment of the debt, and for the benefit of W. S. Trigg, or his heirs, after the debt was paid. The relief granted was consistent with the purpose of the bill and within the scope of the facts alleged in the bill; █ and under the prayer for general relief the court had a right to grant such relief as was consistent with the complaint and the case made by the proof. Griffith's Mississippi Chancery Practice, Second Edition, 1950, par. 187.

 █ It is next argued that the court erred in refusing to hold that the complainants' suit was barred by the statutory limitations imposed in Sections 709, 718 and 719, Code of 1942. But we think that none of those statutes are applicable to the facts in this case. █ it is well settled by the decisions of this Court that the statutes of limitation do not begin to run against persons in actual or constructive possession of lands until an adverse entry has been made. Leech v. Masonite Corporation, 219 Miss. 176, 68 So. 2d 297, and cases cited. The testimony shows that W. S. Trigg remained in possession of the land and exercised complete dominion and control over the land until his death, and that the heirs retained possession of the land after his death and dealt with it as land belonging to the estate until sometime after the sale of the timber to McCoy in 1951. Roy recognized the equitable ownership of the heirs subject to his right to reimbursement for the loans made by him to his father, and the heirs recognized Roy's right to reimbursement for the loans made by him to his father before any division of the proceeds of the sales of timber should be made among them. Roy never asserted any adverse claim to the land until after he had received payment in full for the amounts due him out of the proceeds of the sale of the timber to McCoy. There was a complete lack of proof of an ouster or disseisin of the heirs by Roy prior to the execution of the oil, gas and mineral lease to Stokes on September 1, 1955, and Roy's refusal to divide

the money received by him for the lease among the heirs.

It is next argued that even if the court should hold that the deed created an implied trust or a constructive trust, the complainants' suit was barred by Section 746, Code of 1942, which provides that: ''Bills for relief, in case of the existence of a trust not cognizable by the courts of common law and in all other cases not herein provided for, shall be filed within ten years after the cause thereof shall accrue and not after; * * *.''

■■ ■ But we think the complainants' suit was not barred by Section 746, Code of 1942.

It is undoubtedly true that, ''It is generally held that no repudiation of an implied or constructive trust is necessary to set the statute of limitations in operation. In such cases, the general rule is, at least in the absence of fraud or concealment, that the statute runs from the time when the act was done by which the party became chargeable as trustee by implication or, as it is sometimes expressed, from the time when the cestui que trust could have enforced his right by suit.'' 34 Am. Jur., p. 143, Limitation of Actions, par. 179. See also Cooper v. Cooper, 61 Miss. 676; Rimmer v. Austin, 191 Miss. 664, 4 So. 2d 224; Sullivan v. Nobles, 211 Miss. 330, 51 So. 2d 736; Thames v. Holcomb (Miss. 1957), 92 So. 2d 548. ■■■ ''It is generally held, however, that the rule does not apply to a resulting trust which has every element that operates to take an express trust out of the statute and prevent it from running against the trust until after it has been effectually repudiated; and it has been declared that as long as there is a continuing and subsisting equitable trust acknowledged or acted upon by the parties, the statute of limitations does not apply, but if the trustee denies the right of his cestui que trust, and the possession becomes adverse, lapse of time from that period may constitute a bar in equity.'' 34 Am. Jur., p. 143, supra.

In this case the complainants' proof showed, and the chancellor found, that there was a continuing and sub-

sisting equitable trust which was acknowledged and acted upon by the parties, and Roy did not deny the rights of the other heirs to share equally in the benefits of that trust after the indebtedness due him had been paid, until he refused to divide the money which he had received for the oil, gas and mineral lease in 1955. Under these circumstances the statute did not begin to run until Roy denied the rights of the other heirs and his possession became adverse.

The appellants cite in support of their contention that the suit was barred by Section 746, Code of 1942, Sullivan v. Nobles, supra, and Thames v. Holcomb, supra. But the facts in each of those cases were entirely different from the facts disclosed by the record in this case. In Sullivan v. Nobles, the record showed that Mrs. Eliza Sullivan used her ward's money for the payment of the purchase price of land which she purchased in her own name and for her own use and benefit, which was a wrongful act in its inception, and the court held that her liability as trustee of a constructive trust in favor of the ward "arose upon the instant of the transaction, and upon the same instant the statute began to run in her favor." In Thames v. Holcomb, the heirs and successors in title of S. A. Holcomb and Mrs. Minnie Holcomb conveyed the land to Clyde D. Holcomb, so that he might refinance the Federal Land Bank indebtedness against the property, under an express promise contained in a letter addressed to them by Clyde that, "I will make each one of the heirs a deed to 1/9th part of the estate after I get the loan made." The loan from the Federal Land Bank Commissioner was obtained by Clyde on April 30, 1934, and on that day he and his wife executed a deed of trust to the land bank commissioner, which was acknowledged and filed for record immediately. The suit was filed by the heirs of Mrs. Fannye Holcomb Thames and others against the heirs of Clyde D. Holcomb, deceased, on February 16, 1955. This Court held that the cause of action of the heirs arose and accrued

on the date the land bank commissioner's loan was made and the deed of trust was signed, acknowledged and recorded, and that the claim of the heirs was barred under Section 746, supra. It can be readily seen that neither of those cases is in point here.

It is next argued that the court erred in permitting several of the interested parties to testify concerning matters which occurred after the death of W. S. Trigg. It is argued that these interested parties were incompetent to testify under Section 1690, Code of 1942. But we think there was no error in the court's ruling on that point. The court sustained the appellants' objections to the testimony of the interested parties relating to all matters which occurred prior to the death of W. S. Trigg; and this Court has held that it is not error in a case of this kind to admit testimony of an interested party concerning matters which occurred after the death of the decedent. See Brock v. Crawford, 221 Miss. 105, 72 So. 2d 202.

The appellants' attorneys argue several other points as ground for reversal of the decree of the lower court, but none of those points are of sufficient importance to justify a detailed discussion. We find no reversible error in the record and the decree of the lower court is therefore affirmed.

Affirmed.

All Justices concur, except *Gillespie, J.,* who took no part.